IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**Received**

OCT 2 3 2008

DAVID HOFFMAN and TAMMY )
HOFFMAN, )
            )
     Plaintiffs, )
            )
   vs. )   No. 06 C 6783
            )
GOTCHER & BELOTE and JEFF )
BELOTE, )
            )
     Defendants. )

EVIDENCE DEPOSITION
OF
DAVID J. FLETCHER, M.D.

     Evidence deposition of DAVID J. FLETCHER, M.D.,
taken on Thursday, October 9, 2008, beginning at 4:30 p.m.,
at the offices of Safeworks Illinois, 1806 N. Market Street,
Champaign, Illinois, at the instance of the Defendants,
pursuant to Notice and agreement of the parties, before Lisa
K. Hahn, Certified Shorthand Reporter, Registered Merit
Reporter, and Notary Public in the State of Illinois.

      *   *   *   *   *   *   *   *   *   *

**EXHIBIT**

**B**

APPEARANCES:

       SPIROS & WALL, P.C.
       507 S. Broadway
       Urbana, Illinois 61801
       By: Sandra K. Loeb, Esq.
          Representing the Plaintiffs.

       KONICEK & DILLON
       21 W. State Street
       Geneva, Illinois 60134
       By: Daniel F. Konicek, Esq.
          Representing the Defendants.

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| Direct Examination by Daniel F. Konicek | 3 |

E X H I B I T S

| NUMBER | INTRODUCED |
|---|---|
| Fletcher Exhibit Number 1 | 4 |
| Fletcher Exhibit Number 2 | 42 |
| Fletcher Exhibit Number 3 | 46 |
| Fletcher Exhibit Number 4 | 56 |

1          DAVID J. FLETCHER, M.D., produced, sworn and

2     examined on behalf of the Defendant, testified and deposed as

3     follows:

4

5                    DIRECT EXAMINATION

6                    BY DANIEL F. KONICEK:

7          Q.   Dr. Fletcher, were you hired in this case for the

8     work comp?

9          A.   No.  I was just asked to do an evaluation.

10         Q.   For what matter?

11         A.   I believe because of the pending case that's

12    present; determination of the nature and extent of his

13    condition.

14         Q.   The pending case, you mean the case that's filed in

15    the Northern District of Illinois?

16         A.   Yes.

17         Q.   Have you ever testified in federal court?

18         A.   Yes.

19         Q.   Where?

20         A.   I did it by deposition.  I have not actually

21    testified in U.S. District Court.

22         Q.   You did it by deposition where?

23         A.   Well, the deposition was here.  It was in either

24    Kentucky or Southern Illinois.

                                                              3

1    Q.    So on one occasion you gave a depo?

2    A.    That I recall for a federal case, yes.

3    Q.    And what was your role in this case or what is your

4    role?

5    A.    In this case we're talking about right now?

6    Q.    Yeah.

7    A.    I was asked as an occupational medicine physician

8    to evaluate this patient, determine his present condition,

9    what level of impairment, his work abilities, future medical

10    needs.

11    Q.    And did you do that?

12    A.    Yes.

13        MR. KONICEK:  Could you hand this to Dr. Fletcher?

14    Q.    I've handed you Fletcher Exhibit Number 1.  Is that

15    the report you prepared?

16        (Fletcher Exhibit Number 1 was marked for

17        identification.)

18    A.    Yes.

19    Q.    Can you show me in this report where you have given

20    an opinion regarding his present condition?

21    A.    Well, it's in the clinical impression.  I gave a

22    diagnosis, described what his condition is, showed

23    photographs, made recommendations, reviewed his medical

24    records.

1     Q.   Well, where do you say I, Dr. Fletcher, find that

2   his current medical condition is -- I see where you write a

3   lot about what Dr. Noonan says and the other fellow from

4   Loyola, but where is your impression?  Tell me what page.

5     A.   Well, impression number 3 that I said I examined

6   him and medical records were reviewed --

7     Q.   Wait a minute.  What page?

8     A.   Page 3.  I said he had profound disability.  I said

9   his medical records were reviewed.  I did x-rays currently of

10  his condition, which are listed there below.  I've listed out

11  the large surgical scars, showed photographs.  I talked about

12  his leg discrepancy.  He had to use a crutch.  This is

13  described in detail what his current condition was.  I also

14  attached a pain drawing, what his current subjective

15  complaints were, described in fair detail the examination of

16  his knee on page 12, the demonstrated limited range of motion

17  of his knee.  He's missing a significant amount of motion.

18  His knee was only from 20 to 100 degrees, as opposed to

19  normal being 0 to 150 degrees.  I listed he's got severe

20  atrophy present.  He's got leg length discrepancy.  So, I

21  mean, I really, you know, clearly stated what his present

22  condition was when I examined him.

23    Q.   On page 3, that's one of them where you say he has

24  a very profound length discrepancy so that requires a lift?

1    A.    Yes.

2    Q.    That's your conclusion?

3    A.    Yes.

4    Q.    He has a crutch?

5    A.    Yes.

6    Q.    That's your conclusion?

7    A.    That's why he's using an assistive device, yes.

8    Q.    Is that a medical opinion, or is that just what he

9 said or --

10   A.    That's what he's using.  I mean, he has to use an

11 assistive device.

12   Q.    Do you have a medical opinion that he needs this?

13   A.    Yes, he does.

14   Q.    You've got to wait.  I know you do this quite a

15 bit.  I'm a little slow.  Wait until I finish so I can

16 actually hear what you're saying.

17   A.    Sure.

18   Q.    Did you reach the medical opinion he needs a

19 crutch?

20   A.    Yes.

21   Q.    And where is that contained in your report?

22   A.    Well, I didn't spell it out.  You're asking me a

23 question or affirmation that it's my opinion he needs an

24 assistive device because of the permanent limp that he has.

6

1      Q.    That's not in your report.

2      A.    It's not.

3      Q.    Let's keep going here.  Then you referred me to

4  page 12, and that's where your other conclusions are set

5  forth?

6      A.    Yes, as far as examination findings.

7      Q.    That's what I was just going to say to you.  Stop.

8  What's on page 12 are simply physical findings that you made;

9  correct?

10     A.    Correct.

11     Q.    So other than the conclusion on page 3, he has a

12 very profound leg length discrepancy that requires a lift,

13 are there any other conclusions that are spelled out in this

14 report of your medical opinions?

15     A.    Yes, there are.

16     Q.    Okay.  Show me what page.

17     A.    Page 3, there was no pain behavior.  That's a

18 conclusion.  He was not exhibiting symptom magnification.

19 The second conclusion, he's going to need a knee replacement.

20     Q.    Where do you say that?

21     A.    Right underneath there's no pain behavior.  He will

22 need a knee replacement very shortly, period.  I recommended

23 doing a functional capacity evaluation to determine his

24 present work abilities.

1        Q.    That's a medical opinion?

2        A.    Yes, that's a medical opinion.

3        Q.    Of his condition?

4        A.    That's a recommendation -- it's a recommendation to

5    do additional testing to determine his present work ability.

6        Q.    Did you do the FCE?

7        A.    I did not.

8        Q.    Whether or not he needs an FCE is an opinion

9    regarding his medical condition, is it?

10       A.    Well, it's an opinion -- it's part of the opinion

11   that he needs permanent work restrictions and that's a tool

12   to make a determination for his work ability.

13       Q.    Do you need the FCE in order to make that decision?

14       A.    Well, I know he needs permanent work restrictions,

15   but it would be helpful to clarify his material handling

16   capabilities and endurance abilities with functional testing.

17       Q.    With a functional capacity evaluation?

18       A.    Correct.

19       Q.    And that's a detailed exam of what the patient can

20   or can't do; correct?

21       A.    Correct.

22       Q.    Regarding his entire body -- his upper, lower,

23   middle, whatever -- correct?

24       A.    That's correct.

```
 1      Q.    And that will give you an analysis of the patient's

 2  ability or inability to work to a reasonable degree of

 3  medical certainty; correct?

 4      A.    Correct.

 5      Q.    And that wasn't done; correct?

 6      A.    Correct.

 7      Q.    You say at a minimum he will need a sedentary

 8  job --

 9      A.    Correct.

10      Q.    -- that requires no stair climbs?

11      A.    Correct.

12      Q.    No uneven surfaces?

13      A.    That is correct.

14      Q.    And no knelling?  What's knelling?

15      A.    That should be kneeling.  It's a typo.  Kneeling.

16      Q.    No kneeling or squatting.  You mean of or --

17      A.    And squatting.

18      Q.    No kneeling and squatting.  Did you see this

19  patient?

20      A.    Did I examine this patient?

21      Q.    Yes.

22      A.    Yes.

23      Q.    How long was your exam?

24      A.    Probably about 45, 50 minutes.
```

9

```
1      Q.   When did it occur?

2      A.   Could I have my notebook so I can know exactly for

3   sure?

4      Q.   Yes.

5      A.   5-1-08.

6      Q.   And who performed the exam?

7      A.   I did.

8      Q.   Where?  What office?

9      A.   This office.

10     Q.   Did you take x-rays that day?

11     A.   Yes.

12     Q.   How many?

13     A.   I took one set of bilateral upright knees.

14     Q.   Did you read the x-rays?

15     A.   I read the x-rays, plus we have a radiologist that

16   does an overread.

17     Q.   Who's the radiologist?

18     A.   Sanford Rabushka, R-A-B-U-S-H-K-A.

19     Q.   And did he do an overread in this case?

20     A.   Yes.

21     Q.   Does he have notes?

22     A.   He has a report.

23     Q.   In the file that you have there?

24     A.   Yes, sir.
```

1    Q.   Okay.  I don't have that.  I'm going to need a copy

2 of your entire file.

3    A.   Okay.

4    Q.   You're not a radiologist?

5    A.   No.

6    Q.   You're not an orthopedic surgeon?

7    A.   No.

8    Q.   Have you ever performed a knee replacement?

9    A.   Not since I've been a resident assisting.

10    Q.   Have you ever personally been the primary

11 physician, surgeon, in a knee replacement surgery?

12    A.   No.

13    Q.   And when were you a resident assisting?

14    A.   Back in the early '80s.

15    Q.   Have knee replacement methods changed since then?

16    A.   Dramatically improved.

17    Q.   And have you ever used the new methodology as a

18 physician in order to perform a knee surgery?

19    A.   I haven't been involved in any surgeries since the

20 early '80s, so I've not been involved in the technology in

21 the OR.  I'm familiar with what's available.  I have not done

22 the actual technique.

23    Q.   Did you say you are familiar with the actual

24 technique?

1    A.    No, I'm familiar with the new procedures and

2    options, but I've not been in the OR to actually learn or

3    train on surgical techniques.

4    Q.    Where was the atrophy?

5    A.    Right thigh.

6    Q.    And how do you measure atrophy?

7    A.    Use a tape measure and --

8    Q.    You measure the circumference; correct?

9    A.    Circumference, right.

10   Q.    And what was the right thigh in this case?

11   A.    29 inches, left was 28.

12   Q.    So it would appear, Dr. Fletcher, that the right

13   thigh is actually larger than the left?

14   A.    On that measurement it is, correct.

15   Q.    And what was the injured leg?

16   A.    The right leg.

17   Q.    And you measured atrophy by measuring the

18   circumference?

19   A.    Correct.

20   Q.    And you would have taken the measurement here?

21   A.    My staff did this measurement.

22   Q.    Do you rely on the measurements?

23   A.    I try to.

24   Q.    It would appear there's no atrophy.

1       A.    On the measurement, that's correct.  Visually there
2   is, but the measurement does not support that.
3       Q.    Which suggests that Mr. Hoffman has been using his
4   right leg?
5       A.    He's been using his right leg.
6       Q.    In fact, it appears to have a greater circumference
7   than the left?
8       A.    Yes, using the circumferal measurement, it does,
9   yes.
10      Q.    Which would suggest the muscle in the right is
11  bigger than the left?
12      A.    That could be one explanation, yes.
13      Q.    And then the calf circumference is equal?
14      A.    Correct.
15      Q.    Meaning there's no atrophy in the calf?
16      A.    Correct.
17      Q.    In fact, there's no demonstrative -- I'm going to
18  withdraw that question.  There's no evidence of atrophy set
19  forth in the physical exam, is there?
20      A.    On observation there was, but the circumferal
21  measurements reading does not support that.
22      Q.    You filled out the exam sheet?
23      A.    Yes.
24      Q.    Exhibit 1, page 12, read to the ladies and

13

1  gentlemen of the jury where you state what word you state

2  after atrophy.

3      A.  "No."

4      Q.  Okay.  Did he have a lift, that is Mr. Hoffman, on

5  the day you saw him?

6      A.  A shoe lift?

7      Q.  Yes, sir.

8      A.  No.

9      Q.  Who prepared the summary of the doctor visits with

10 Dr. Noonan?

11     A.  I did.

12     Q.  What do you do?  Just look at the records of

13 Dr. Noonan and dictate them?

14     A.  I look at those and highlight those and have my

15 transcriber put in that information.

16     Q.  You highlight the record?

17     A.  I point out to them what I feel is pertinent

18 information.

19     Q.  How do you do that?

20     A.  I show them the documents that I feel are the most

21 pertinent.

22     Q.  Who's the transcriber?

23     A.  I've got a couple different transcribers.

24     Q.  Who was the transcriber for this report, Exhibit 1?

14

1     A.     Mary Scott.

2     Q.     Is she still employed by you?

3     A.     Yes.

4     Q.     So you're telling me that you would have sat with

5   her and said these are the highlights I want?

6     A.     These are the highlights I want.

7     Q.     And then she would what, type it?

8     A.     She would type those in.

9     Q.     Or would she write it out?

10    A.     She would type them.

11    Q.     How long did this medical summary take between you

12   and her?

13    A.     I don't recall the exact amount of time.

14    Q.     Do you bill by the hour?

15    A.     It depends on the case.  I basically bill a

16   straight fee for a thousand dollars for this exam.

17    Q.     For the report or the exam?

18    A.     Both.

19    Q.     How do you calculate what you should charge?

20    A.     It depends on the situation.  What I've agreed on

21   from the referral source.  If it's just a straight exam, if

22   it's going to be extra legal work, I usually charge $500 an

23   hour for medical/legal work.

24    Q.     When you say it depends on the referral source,

15

1    what do you mean by that?

2        A.   Well, some I have prearranged agreements.   There

3    are maybe some agreements beforehand as far as the type of

4    scope and report and exam and the nature of work I'm doing.

5        Q.   What referral source are you referring to?

6    Lawyers?

7        A.   Well, I have referral sources from employers,

8    attorneys, government agencies, a variety of sources.

9        Q.   So if you do work for -- a significant amount of

10   work for a certain attorney, you may charge a lesser fee?

11       A.   Usually not for attorneys.   Usually it's situations

12   from governmental agencies, there's some prearranged -- they

13   have some constraints as far as fees they can pay.

14       Q.   What governmental agencies?

15       A.   Like Illinois Department of Transportation, State

16   Retirement System.

17       Q.   So if an employee of IDOT is injured, they send the

18   employee over here.   You perform an exam?

19       A.   Well, it depends on if it's a situation where I'm a

20   treating physician or I'm examining physician.

21       Q.   More often than not you're an examining physician,

22   aren't you?

23       A.   No.   More often than not, I'm a treating doctor.

24       Q.   Are you telling me IDOT refers patients to you?

                                                              16

1     A.   Yes.

2     Q.   Who's their referral source at IDOT?

3     A.   A variety of people.

4     Q.   Name them.

5     A.   Well, they have a coordinator that does fitness for

6  duty evaluations named Ree Malik Robinson.  I actually have a

7  competitive bid state contract through 2010 that I've held

8  since 1992 with IDOT.  It's public information if you want to

9  retrieve the document.

10    Q.   I already have it.  Okay.  Who else?

11    A.   As far as from IDOT?

12    Q.   Fitness for duty, do you consider that to be a

13  treatment of a patient?

14    A.   That's not a -- that's not an exam.

15    Q.   Right.  We were talking about treating patients.

16    A.   Treating patients?  I get them from a variety of

17  the district agencies that send them in for the -- for

18  treatment of work injuries.  It's a variety of different

19  sources.  I'd have to look at some of the names to get those.

20    Q.   Can you name one?

21    A.   Well, I talked about Ree Malick Robinson.  I want

22  to say someone named Price.  They've changed a lot because

23  IDOT went from -- they used to be a self department for

24  workers' comp to CMS to Central Management Services.  Some of

1    the adjusters I deal with Central Management Services is

2    Carol Moomey, Elise Ingle.

3        Q.    Moomey?  M-O-O --

4        A.    M-E-Y.

5        Q.    When CMS is sending people over here, that's not

6    for medical treatment?

7        A.    No, they send people for medical treatment here.

8        Q.    Is a majority of their referral here for

9    examination?

10       A.    No, for medical treatment.  It varies.  I mean, I'm

11   both a treater and an examiner.

12       Q.    Okay.  What attorneys refer you their clients?

13       A.    Do you want me to list 30 or 40 different firms?

14       Q.    I don't know.  Are there that many?

15       A.    Yes.

16       Q.    Why don't you --

17       A.    Are you talking about defense, respondent,

18   petitioner, plaintiff?

19       Q.    I don't do work comp.  Never have, never will.

20       A.    Okay.

21       Q.    So you're going to have to educate me.

22       A.    Okay.  As far as, oh, we'll say petitioner/

23   plaintiff firms, Sandy's firm, her former firm in Champaign

24   of Fredrick & Hagle.  In Danville, Tuggle, Schiro,

1   Lichtenberger; Kanoski & Associates; Gannison out of Peru;

2   William Cannon Associates in Springfield. Tim Shay &

3   Associates; Steve Perbix Law Firm; McCarthy, Rowden & Baker.

4   In Chicago I get referrals from Casey, Woodruff & Johnson

5   firm. Williams & Swee is a firm in Bloomington I get cases

6   from. In Peoria I get cases from Janssen Law Firm. That's

7   pretty much a quick hit for petitioner/plaintiff firms.

8   Defense counsel's Chicago, Keefe & Associates; Hennessy &

9   Roach; Maciorowski, Sachman & Ulrich. Downstate, Heyl

10   Royster, Voelker & Allen. Winters, Featherstun in Decatur.

11   Knell & Kelly in Peoria. Attorney General for the State of

12   Illinois. That's kind of a good cross section of firms.

13      Q.   Now, when these law firms refer people, obviously

14   in the defense perspective they're asking you to do an

15   Independent Medical Exam?

16      A.   Yes.

17      Q.   And the person that's injured on the job comes

18   here, comes to your office in either Decatur or Champaign?

19      A.   Or Chicago.

20      Q.   You have an office in Chicago now?

21      A.   Yes.

22      Q.   Where?

23      A.   800 South Wells, River City. Midwest Ortho, Rush.

24      Q.   You're with Midwest Ortho?

1      A.    I rent from them, yes.  I'm a tenant in their

2   building, their office.

3      Q.    Are you affiliated other than by virtue of tenancy?

4      A.    No.  It's tenancy at this time.

5      Q.    Going back to my question.  From the defense

6   perspective, these defendant firms ask the injured person to

7   come to you and you perform a physical exam in one of these

8   three offices that you have; correct?

9      A.    Correct.

10     Q.    And then you generate a report as to whether or not

11  the person's injured?

12     A.    That's part of the usual questions, yes.

13     Q.    And then whether or not the injury is permanent?

14     A.    Yes.

15     Q.    Whether or not the person can go back to work in

16  some capacity?

17     A.    Yes.

18     Q.    Anything else you would do in that instance?

19     A.    It depends on what the questions are.  Is there a

20  causal relationship between the injury and the present

21  condition, you know.  Are there pre-existing conditions that

22  may be a factor?  What can be done for treatment to help this

23  person?  Is the proposed treatment reasonable and necessary?

24  A variety of questions.

1     Q.   Now, from the Plaintiff's perspective --

2     A.   Same questions.

3     Q.   You do a lot of work for Spiros & Wall?

4     A.   No, not a lot.  I've done three or four cases for

5 them before.

6     Q.   Have you done more than that?

7     A.   I don't think so.  I'd have to check my records.  I

8 don't recall more than three or four cases.

9     Q.   And then you said you had done work for Ms. Loeb's

10 firm when she was with another company?

11    A.   Yes.

12    Q.   What was the name of that?

13    A.   Frederick & Hagle.

14    Q.   How much work did you do for them?

15    A.   I've probably done in the last four or five years

16 probably 35, 40 cases.

17    Q.   So you've done a lot of work for Ms. Loeb who's

18 here today?

19    A.   Not for her personally but for her former law firm.

20    Q.   Okay.

21    A.   I mean, I've have had prior interaction with

22 Ms. Loeb when she worked for that firm.

23    Q.   Right.  That's what I meant.

24    A.   Right, but not 30 or 40 cases.  Probably 3 or 4.

1     Q.   But the firm she was with had done 30 to 40 cases?

2     A.   Correct.

3     Q.   And I understand that you said that you pretty much

4 look at the same thing from the Plaintiff's perspective, but

5 let's just make a record here.

6          So, when a firm like Ms. Loeb's of Spiros & Wall

7 sends their client here, you go through the array of

8 questions, was the person injured at work?

9     A.   Correct.

10    Q.   Was it causally related?

11    A.   Correct.

12    Q.   What's the nature of the injury?

13    A.   Correct.

14    Q.   Can they return to work?

15    A.   Correct.

16    Q.   When I made a phone call here, you've got one of

17 those telephones that when I'm put on hold it sort of gives

18 an infomercial about your business.

19    A.   Try to market.

20    Q.   Most of the infomercial was about getting the

21 injured person back to work and said that that's what your

22 company specializes in?

23    A.   Yes.

24    Q.   Through work hardening?

1      A.   Yes.

2      Q.   Vocational rehabilitation, do you do that here?

3      A.   Well, we have consultants we utilize for that and

4  assist in that process.  I don't have a vocational rehab

5  person on staff.  I mean, I'm very familiar with the process,

6  but we don't have an actual vocational person.  We contract

7  for that.

8      Q.   In any event, it is the goal of the patients -- let

9  me withdraw the question.  It is the goal of your firm, your

10  company that's called Safeworks Illinois, that when a patient

11  comes here, you want to rehabilitate that person so that they

12  can return to a job; correct?

13      A.   Correct.

14      Q.   And one of the tools that you use is to perform a

15  functional capacity evaluation to determine the nature and

16  extent of the injury and exactly what that person can or

17  can't do from a functional standpoint; correct?

18      A.   That's correct.

19      Q.   And then from the functional capacity evaluation,

20  would you go into a work hardening, or is that done before?

21      A.   Oftentimes an FCE is done as a baseline, and

22  depending on the results of the FCE and the nature and the

23  condition, you would make the determination if work hardening

24  would be appropriate.  You'd make -- set some goals, what

23

1  type of objectives are going to be achieved by work

2  hardening.  Ideally, that would be something I'd recommend.

3  I'm in business to help patients get better, be more

4  functional and be able to get back to work.  That's what my

5  business is all about.

6      Q.   Which part of your business?

7      A.   That's the main trust of occupational medicine is

8  to help patients recover, rehabilitate, and return back to

9  work.  That's what I do.

10     Q.   I understand that, but, also, a part of your

11 business is to act as a witness in cases where you don't even

12 treat the patient; right?

13     A.   That's part of the process of occupational medicine

14 because trying to make a determination of the medical/legal

15 process to have somebody -- some third party objectively

16 review all the records because very few times a treating

17 doctor will read the entire medical file and have any

18 qualifications to make determinations about return to work.

19 I mean, that's the nature of the specialty of occupational

20 medicine.  If you go in it, you have to expect to be a

21 witness frequently.

22     Q.   My question was part of your work includes being

23 hired by lawyers; correct?

24     A.   It is.

                                                          24

1    Q.    And in that work where you're hired by lawyers, you

2  are not the treating physician; correct?

3    A.    No, I'm the examining physician.   Sometimes it will

4  happen where that person will want you to change from an

5  examining doctor to a treating doctor maybe 10, 20 percent of

6  the time, but I try to remain just an examiner.

7    Q.    Well, you're actually not an examiner in the sense

8  when a lawyer sends a person here, you're -- there is no

9  physician/patient relationship; correct?

10   A.    There is no patient/physician relationship.

11   Q.    So --

12   A.    I'm an examining physician.

13   Q.    Well, when asked that you respond to this question,

14  because what happens in federal court, this is evidence,

15  okay, so I'm going to move to strike your answer.   When a

16  person is sent here by a lawyer, there is no

17  physician/patient relationship; correct?

18   A.    Unless they consent for me to be the treating

19  physician, and I have them sign a consent then, which my role

20  would change.

21   Q.    Otherwise, there is no physician/patient

22  relationship; correct?

23   A.    Correct.

24   Q.    There is no physician/patient relationship in this

25

1    case with Mr. Hoffman?

2        A.   I did not have patient/physician relationship.

3    Strictly an examiner.

4        Q.   Do you have some type of policy or statement that

5    says you are not the treating physician and you cannot be

6    held liable?

7        A.   No.

8        Q.   Or responsible for their outcome?

9        A.   I don't have a statement like that.  Are you kind

10   of referring to the fact as far as from a medical/legal

11   protection as an examining physician?

12       Q.   Yes.

13       A.   I do not have a detailed statement to that effect,

14   and also my experience is being an examining physician does

15   not protect you from medical/legal issues.

16       Q.   Okay.  In terms of medical/legal income, that is

17   where you are asked to examine a person for purposes of

18   testimony or medical/legal opinion over the course of the

19   last five years, that income has been in excess of $500,000?

20       A.   As far as gross income?

21       Q.   Yes.

22       A.   Yes.

23       Q.   It's been over a million dollars as far as gross

24   income.

                                                            26

1    A.    The last five years?

2    Q.    Yes.

3    A.    Possibly, yes.

4    Q.    Has it exceeded two million dollars?

5    A.    No.

6    Q.    Give me a rough estimate over the last five years.

7    Somewhere between one and two million dollars?

8    A.    Yes.

9    Q.    Okay.  Earlier I was asking you whether or not you

10   gave some sort of discount to entities or persons that have a

11   high volume of referrals to you.  You indicated that there

12   was such a discount related to IDOT.  Are there any others?

13   A.    I think a couple IME brokerships.  That would be

14   something I'd have to research.

15   Q.    When you say IME brokerships, what's that?

16   A.    There's some national firms that are intermediaries

17   between law firms and insurance companies to find physicians

18   to perform examinations.

19   Q.    You subscribe to these brokerships?

20   A.    I don't subscribe to them.  They seek me out.

21   Q.    Who are they?

22   A.    There's an organization called MEI is one.  It's

23   out of Wisconsin.  And there's another one in -- another one

24   in Wisconsin.  I want to say PMRI is an IME brokership.

1  Occasionally we'll get some things from CorVel and Jennex

2  that will try and negotiate on a case-by-case basis some

3  things.

4      Q.   Okay.  And so the jury understands, when you say

5  brokership, you mean there's companies out there that broker

6  injured people, from lawyers to independent medical examiners

7  such as yourself; correct?

8      A.   I don't think they broker injured workers.  They're

9  basically a locator for insurance companies and defendants

10  and plaintiff's counsel to locate a physician that performs

11  medical/legal exams.

12      Q.   I'm not trying to be pejorative or negative, but,

13  in essence, they're brokering the patient to a independent

14  medical examiner?

15      A.   I guess I thought, Counselor, that your statement

16  was somehow the injured worker had some kind of say in this.

17  These are set up for a medical/legal where an injured worker

18  has to show up for an exam.

19      Q.   I understand that and, thus, what I'm saying is

20  this independent company MEI or PMRI, what they do is they

21  get a phone call from, let's say, an attorney that says I

22  need my guy to get an independent medical exam; do you know

23  somebody?

24      A.   Correct.

1      Q.   The broker says, "Yeah, I know some guy down at

2  Safeworks Illinois there in Decatur.  He's on our panel.

3  I'll send the person there;" correct?

4      A.   Correct.

5      Q.   And you say that in those circumstances there may

6  be a discount?

7      A.   There may be.  There may be some kind of

8  commission-based thing.  I'd have to look it up and research

9  it.  I have to say it's not the typical question I'm asked in

10  depositions, but I can provide that information subsequently

11  if that's important to you.

12      Q.   Okay.  When you say commission-based, when the

13  broker sends that patient to you, the broker receives a

14  commission; correct?

15      A.   Well, they get -- they obviously upload my charge

16  to their client.  That's how they make their money.

17      Q.   And when you say they upload your charge to the

18  client, are you saying just, for example, you charge a

19  thousand dollars, the broker gets 10 percent of that?

20      A.   No.  Normally what will happen, you know, if he

21  negotiates a fee with me to do the exam for a thousand, he

22  may charge that client like $1,250.

23      Q.   12 dollars and 50 cents?

24      A.   $1,250.

1    Q.   Oh, I see.  And then he keeps the $250?

2    A.   Correct.

3    Q.   Okay.

4    A.   That's pretty much how it's done in the business.

5    Q.   Okay.  And do you have some sort of written

6  agreement, then, with these people?

7    A.   I've got a variety of different agreements that

8  they send us.

9    Q.   But it is a written agreement, yes?

10    A.   Yes.  Some of them are written, yes.

11    Q.   Where you agree to a discount by taking a certain

12  volume of patients.

13    A.   It's on a case-by-case basis, and I have to again

14  research that.

15    Q.   Okay.  Then you said you charge for additional work

16  at an hourly rate if the case goes into litigation?

17    A.   Right.  If I'm asked to do more -- review more

18  deposition transcripts, meet with attorneys, testify live,

19  prepare medical/legal support information.

20    Q.   Okay.  And what is your charge?

21    A.   $500 an hour for that.

22    Q.   And what do you base that charge on?

23    A.   Well, I have 40 employees that I support for my

24  business and I have to make sure that when I have that type

30

1  of overhead that I have that type of recovery for the

2  overhead I have.

3       Q.   Okay.  And then do you keep time somehow?  Do you

4  record your time?

5       A.   Yes.

6       Q.   In what fashion?

7       A.   How do I record it?

8       Q.   Yes.

9       A.   Like a handwritten note, and then I'll provide it

10  to my billing staff, and if it's a medical/legal case, I'll

11  have, like, a spread sheet log.

12      Q.   You'll have the spread sheet log?

13      A.   I'll put together a spread sheet and then I'll

14  provide it to my billing people.

15      Q.   So you'll keep a handwritten document and then at

16  some point you go into your own computer and put it on a

17  spread sheet?

18      A.   Correct.

19      Q.   Do you do it for all of your cases, or do you have

20  individual spread sheets for each case?

21      A.   An individual spread sheet for each individual

22  case.

23      Q.   Is there some sort of master list for the open

24  cases?

1    A.   No.

2    Q.   How do you keep track of how many cases you have

3  open?

4    A.   I don't really have a good system for that.  I have

5  a calendar when a potential case may be in trial in the

6  future, but it's hard for me to keep up with what's an open

7  case because a lot of the cases I get involved in settle and

8  I don't know, so it's kind of a difficult thing for me.

9    Q.   How do you know when to close a file?

10   A.   Usually when I've not heard from somebody in a

11 year.  I found actually to extend that to two years because

12 suddenly I get called to do something that comes out of the

13 blue.

14   Q.   Do you separate your medical/legal work from your

15 actual patient work?

16   A.   We have the files in medical/legal work different

17 from the treating files mainly because most of the

18 medical/legal work are in notebooks like this, as opposed to

19 a regular patient file.

20   Q.   And what about the billing?  Is that also

21 separated?

22   A.   No.  It's is same computer system, same accounts

23 receivable system.

24   Q.   Even though it's under the same system, within that

32

1    system is it separated?

2         A.   Well, the CPT code for medical testimony would be

3    generated.

4         Q.   Okay.  So somebody could go into your system and

5    look and tell me what's medical/legal work and what's not;

6    correct?

7         A.   Correct.

8         Q.   And using the CPT code?

9         A.   Correct.

10        Q.   What is the CPT code for medical/legal?

11        A.   I'd have to look it up.  I could find it if you

12   need me to do that.

13        Q.   Yeah.  Mary Scott, is she your office manager?

14        A.   Yes, uh-huh.  I could try to get that for you if

15   you want me to get that subsequent to the dep.  It's 99075.

16        Q.   And where are you reading that?

17        A.   From the disclosure here where it's got my CPT code

18   when you requested medical/legal income.

19        Q.   I'm looking at your document that you produced.

20   Where do you see that, Dr. Fletcher?

21        A.   CPT.  Usage page 1 of 12.

22        Q.   Right.

23        A.   There's a procedure visit.  That's the code.

24        Q.   Right.

                                                              33

1     A.   99075, upper left-hand corner.

2     Q.   Right, got it.  Have you ever prepared a Rule 26

3  Report?

4     A.   That's for federal court?

5     Q.   Right.

6     A.   I believe in the case I did for the railroad there

7  was some kind of -- that type of report, but I'd have to look

8  it up because it was about five years ago.

9     Q.   You handled a FELA case?

10    A.   FELA, you mean Federal Employee Liability for

11  railroad docs?

12    Q.   Yes.  One?

13    A.   I've done several of them.

14    Q.   One was only in district court.

15    A.   Most of my railroad cases have been in district

16  court as opposed to federal.  This was a federal case.

17    Q.   Okay.  And then in terms of the breakdown,

18  Dr. Fletcher, just focusing on the medical/legal, if you were

19  to trying to tell us I do X percent for plaintiff, Y percent

20  for defendant, over the last five years, how would you break

21  that down?

22    A.   30, 35 petitioner/plaintiff; 60/65 percent

23  defendant.

24    Q.   And what insurance companies generally hire you?

34

1    A.    Well, it's hard to say because a lot of time I

2  don't know what an insurance company is because it goes

3  through an attorney.  I've done stuff for Allstate.  I've

4  done stuff for State Farm, a lot of different work comp

5  carriers.  I've done stuff for Chubb, Liberty Mutual.  Those

6  are some of the ones that I've done.

7    Q.    Okay.  On your report here under Rule 26 of the

8  federal rules you were required to identify what documents

9  you reviewed in order to reach the opinions that you've

10  reached.  That's not set forth in your report here.

11    A.    Okay.

12    Q.    Would you be able to tell me what documents?

13    A.    Yes.  These documents are in this notebook.  I

14  could give you a copy of the notebook.  You could take it and

15  make a copy or have the court reporter make them and send it

16  to you.

17    Q.    Okay.  Let's do that, and then we can avoid to have

18  them read them into the record.

19    A.    Okay.

20    Q.    Under the compensation -- on the disclosure

21  paragraph 5, it says you're paid $750 for the first hour and

22  $500 for each additional hour spent regardless of activity?

23    A.    Correct.

24    Q.    What's that referring to?

35

1    A.    That was for the deposition for the -- basically,

2    how I do it is charge a thousand dollars for deposition

3    basing an hour, $750 for the dep and some prep time, being a

4    thousand dollar together.   Then if there's time after that,

5    $500 an hour.

6    Q.    And then let's say you travel.   It looks like

7    you've testified in court.   I'm just going to guess it looks

8    like about a dozen times.

9    A.    Correct.

10   Q.    Do you charge to go to court?

11   A.    Yes.

12   Q.    $500 an hour?

13   A.    Yes.

14   Q.    So in this case it's in the Northern District of

15   Illinois?   Do you know where that courthouse is?

16   A.    Yes.

17   Q.    In Chicago?

18   A.    I know exactly where it's at.

19   Q.    You would charge to drive from Champaign or Decatur

20   $500 an hour?

21   A.    Monticello.

22   Q.    Monticello?

23   A.    Yes.

24   Q.    So from Monticello to Chicago, $500 an hour; am I

36

1   correct?

2       A.  Yes.

3       Q.  Are any of these cases still pending under the list

4   of live testimony in Exhibit 1?

5       A.  Dennis Hildebrand is -- they did tentative

6   settlements for the work comp.  He has a third party case

7   that I may have to testify in.  Carol Kirk is a case where

8   I'm a defense expert.  It's been postponed for trial sometime

9   in February of '08.

10      Q.  Dr. Fletcher, where is that case pending?

11      A.  Macon County.

12      Q.  And who hired you in that case?

13      A.  Hinshaw & Culbertson was the law firm out of

14  Peoria.

15      Q.  Who's handling it for Hinshaw?

16      A.  A lady named Rhonda Patten.

17      Q.  It looks like you've billed about $20,000 on that

18  case?

19      A.  On the Carol Kirk case?

20      Q.  Yes.

21      A.  That's probably high.  I can get an exact printout

22  and tell you exactly what is it if that's something that you

23  want.

24      Q.  No, actually, I'm looking at the wrong one.  I'm

                                                        37

1 looking at this Crotchin.

2  A. Yeah, that was a live trial in Chicago. I was a

3 defense expert in that case.

4  Q. Albert Crotchin, whatever.

5  A. That's how I always pronounced it, too.

6  Q. That one you testified live in Cook County?

7  A. Yes.

8  Q. When was that?

9  A. Over a year ago.

10  Q. And were you hired by the defense or plaintiff?

11  A. Defense.

12  Q. And who was the defense lawyer there?

13  A. I'd have to look it up. It was a firm I don't deal

14 with too much, but I could subsequently get you that.

15  Q. Okay.

16  A. Their office is 51st floor of Sears Tower.

17  Q. Schiff, Harden & White? Armstein & Loehr?

18  A. No, my daughter's been hired by Schiff. It's below

19 them. I'll have to find out. I can tell you subsequently if

20 that's something you want.

21  Q. Okay. That's the one where I saw that you charged

22 over $20,000 and I was --

23  A. I spent a lot of time on it.

24  Q. What was the nature of the injury there?

38

1    A.   It was a guy who was a teamster driver who got in

2    an auto accident hitting something as a delivery driver, a

3    property in the suburbs which is owned by a very famous U of

4    I basketball player, and he claimed he could not go back and

5    be a truck driver, and so it was an issue on nature and

6    extent of injury and vocational issues and ability to be a

7    truck driver.

8    Q.   And what were the nature of his injuries?

9    A.   He had a wrist injury which he alleged was related

10   to this traumatic event.

11   Q.   Was there a broken wrist?

12   A.   He had what's called a slack wrist, which is a

13   degenerative condition that resulted in a fusion condition.

14   Q.   A surgical fusion?

15   A.   Yes.

16   Q.   And that prevented him from driving a truck?

17   A.   That's what he alleged.

18   Q.   Did you disagree with it?

19   A.   I disagreed with it.

20   Q.   You don't think a fused wrist would prevent

21   somebody from driving a truck?

22   A.   No.

23   Q.   Why?

24   A.   Because the fused wrist the guy had a hundred

1   pounds of grip strength.  All he had was loss of motion.  He

2   was able to drive a vehicle.  I have a special expertise in

3   trucking issues and functional testing and everything clearly

4   showed this guy could be a truck driver.

5        Q.   Did you put him through an FCE?

6        A.   He had an FCE at another facility but that was part

7   of the evaluation process.  It was a comp case and then there

8   was the PI case.  I was involved in the PI case.

9        Q.   What was the result?

10       A.   Unfavorable.  The defense had to pay out about

11  $800,000 on it.

12       Q.   So the jury concluded he couldn't drive a truck?

13       A.   I guess they did.  I still disagree.

14       Q.   You have not reached any opinions in this case

15  whether Mr. Hoffman can or cannot drive a truck?

16       A.   I would really like to get the functional testing

17  to be able to make a definitive opinion, so that would be

18  something I would have to formulate.

19       Q.   I'm going to need the x-rays that you took, copies.

20       A.   Sure.  I can try to get those right now if you want

21  to wait just a second.

22       Q.   Sure.  In any event, the x-ray showed that the

23  right knee still had the hardware that was put in by

24  Dr. Noonan?

                                                              40

1      A.    Correct.

2      Q.    The comminuted fracture appeared healed?

3      A.    Correct.

4      Q.    And what the fellow has is some degenerative

5 changes; correct?

6      A.    Correct.

7      Q.    But you weren't able to determine the nature and

8 extent of those; correct?

9      A.    Well, I think the x-ray speaks for itself.

10      Q.    I can't get it to talk in front of the jury.  Were

11 you able to determine the nature and extent?

12      A.    He had some pretty significant narrowing.

13      Q.    You understand that there's called grade 1, grade 2

14 and the like?

15      A.    Yes.

16      Q.    That does not appear in your report here.

17      A.    That's the radiologist's report.

18      Q.    Do you have the radiologist's report?

19      A.    Yes.  Let me get the films.  I haven't looked at

20 them in a while.  Grade 1.  That's how I would grade it.

21      Q.    Before you answer, take a look at Exhibit 2.  Is

22 that the report that you just looked at?

23            (Fletcher Exhibit 2 was marked for

24            identification.)

1      A.    Yes.

2      Q.    That's your fellow that does the reading of the

3 x-rays?

4      A.    Yes.

5      Q.    What's the person's name?

6      A.    Sanford Rabushka.

7      Q.    Is Dr. Rabushka a medical doctor?

8      A.    Yes, board certified radiologist.

9      Q.    And is he or she an employee of yours?

10     A.    No.   It's a contractual relationship we have with

11 that radiology firm.

12     Q.    What's the name of the firm?

13     A.    Lakeland Associates.

14     Q.    So you 1099 Dr. Rabushka?

15     A.    They actually have a situation where we provide the

16 films and the demographics of billing and they do a direct

17 bill, so I don't do a 1099, so they end up billing the

18 patient directly, or the referral source.

19     Q.    So, in this case, the x-ray would have been billed

20 through the Lakeland facility?

21     A.    The actual x-ray, the performance of the x-ray by

22 my tech and the actual x-ray was in my office.   The

23 professional overread, they bill directly.

24     Q.    How did they get the x-ray?

1  A. We have a courier.  We have a relationship with

2 Provena Hospital.  They're the staff radiologist for Provena

3 Hospital, and then they get the pack of films and they read

4 it and --

5  Q. Do they get the original?

6  A. They get the original.

7  Q. And then they send the original back?

8  A. Correct.

9  Q. Give me the full name of Dr. Rabushka's company?

10  A. Lakeland Radiologist.

11  Q. Located --

12  A. They have an office in Mattoon and also in

13 Champaign.

14  Q. Okay.  Dr. Rabushka didn't grade the -- don't

15 answer.  Dr. Rabushka didn't grade the degenerative

16 condition, did he?

17  A. He did not use a grading system.

18  Q. And I assume you sent x-rays or have this

19 relationship with Lakeland because they're radiologists who

20 are qualified to read x-rays; correct?

21  A. Well, they're obviously qualified to read x-rays as

22 radiologists.  It's not because we're not qualified to read

23 them.  Just from medical/legal protection, the type of

24 practice I do doesn't have a professional read.  There are

43

1  times when I disagree with the radiologist.  Because I have a

2  more clinical history, I may review it with him, but it's

3  just standard in my specialty to have an overread.

4      Q.  Well, in this case, Mr. Hoffman wasn't a patient of

5  yours.

6      A.  He wasn't a patient, but still I performed an x-ray

7  and that's our practice is to have a professional overread.

8  I wasn't a treating doctor but still that's how I do my

9  practice.

10     Q.  So what I see in your report here is what

11 Dr. Rabushka wrote.

12     A.  Correct.

13     Q.  Where's what you wrote?

14     A.  Well, I basically agree with him.  He's got

15 narrowing of the medial compartment.  He's got evidence of

16 hardware present.  His fracture is healed.

17     Q.  Right, but we're focusing on the degenerative

18 condition and he simply states there are degenerative changes

19 without grading them.

20     A.  Well, I think a lot of it is his focus is not so

21 much on the medical/legal but just making a notation that's

22 there.

23     Q.  So my question is if you have a different opinion,

24 why doesn't it show up in your report?

44

1     A.    Because it really didn't have any clinical

2 relevance to me.

3     Q.    Okay.  Hold on.  A grade 1 degeneration has no

4 clinical relevance to you?

5     A.    It has clinical relevance, but as far as it wasn't,

6 in my opinion, necessary to state a separation with that.  He

7 does not have severe bone-on-bone narrowing.  He has some

8 narrowing based on -- I gave an opinion he's going to need a

9 knee replacement based on his clinical exam and my

10 experience.

11    Q.    Right.  The x-ray actually shows a pretty well

12 preserved knee.

13    A.    Well, you've got hardware there.  He's got limited

14 motion, and so the biomechanics is going to -- eventually is

15 going to wear out.  It's not the worst knee in the world.

16 It's not a normal knee.

17    Q.    It's not a grade 2 and it's not a grade 3.

18    A.    Correct.

19    Q.    And it's not a grade 4.

20    A.    Correct.

21    Q.    And do you know when the surgery was?

22    A.    The surgery for his open reduction internal

23 fixation?

24    Q.    Right.

1    A.   Let me give you the exact date.

2    Q.   Who took this x-ray?

3    A.   The woman who just came in here.

4    Q.   Is she a certified technologist?

5    A.   Yes, she has a license.

6    Q.   Did you ask her to retake this?

7    A.   What?

8    Q.   Did you ask her to retake this?

9    A.   No.

10   Q.   And you felt comfortable with what I'm going to

11   mark as Exhibit Number 3 in concluding that there are

12   degenerative changes based on this x-ray?

13             (Fletcher Exhibit Number 3 was marked for

14             identification.)

15   A.   Yes.

16   Q.   Okay.

17   A.   4-29-03.

18   Q.   So five years; right?

19   A.   Yes.

20   Q.   With very little degenerative changes, despite the

21   hardware that's in this gentleman's leg; correct?

22   A.   I wouldn't say very little.  I would say some.

23   Q.   How old was he when you took these x-rays, or your

24   technician took the x-ray?

                                                        46

1 A. Thirty-four.

2 Q. When your technician took the x-ray he was 34?

3 A. I'm sorry.  He was born in -- he was born in '68 so

4 he's 40.  I apologize.

5 Q. Do you expect to see degenerative changes in a

6 40-year-old?

7 A. It depends on their weight and other factors.

8 Q. Right.  What do we know about this guy's weight?

9 A. He's big.

10 Q. Would you expect to see degenerative changes in a

11 fellow of his weight and his age?

12 A. They could be present, but we have a controlled

13 knee that's different than the involved knee that shows that

14 he doesn't have the type of narrowing that's present on the

15 right knee.

16 Q. Did you measure the narrowing?

17 A. I can eyeball it.

18 Q. Okay.  You didn't measure the narrowing; correct?

19 A. I did not measure the narrowing.

20 Q. And what you're telling me is you reviewed the

21 x-ray taken by your technician and you eyeballed it in order

22 to make the conclusion that there were some degenerative

23 changes in the right knee; correct?

24 A. I --

1     Q.   Is that correct?

2     A.   I made that conclusion, correct, as well as the

3 radiologist.

4        MR. KONICEK:  I'm going to move to strike "as well

5 as the radiologist" from his answer as nonresponsive.  Now,

6 are you qualified to dictate when a patient should or should

7 not have a knee replacement surgery?

8     A.   Yes.

9     Q.   What qualifies you?

10    A.   It's part of the specialty of occupational medicine

11 with utilization review.

12    Q.   Are you telling me you could refer a patient to an

13 orthopedic surgeon and that orthopedic surgeon could simply

14 do a knee replacement based on your statement?

15    A.   I'm sure he would examine and make his own

16 independent judgment and he would conclude with that.

17    Q.   Ultimately, it's the orthopedic surgeon's decision

18 whether or not a patient needs a knee replacement, not you an

19 occupational doctor; correct?

20    A.   Well, he's the one doing the surgery, but he's

21 going to have to concur or disagree with that, but I'm

22 involved in getting authorization for those procedures,

23 saying it's reasonable and necessary, based on using American

24 College of Occupational Medicine Practice Guidelines.

48

1          MR. KONICEK:   Okay.   I'll move to strike everything

2    after no.

3          Q.   Would you recommend a knee replacement surgery for

4    a person that has a grade 1 degenerative condition in their

5    knee?

6          A.   Not at this time.

7          Q.   I didn't think so.   What about a grade 2,

8    Dr. Fletcher?

9          A.   It depends on how much interference are in the

10   activities of daily living.

11         Q.   I'm sorry?

12         A.   How much it interferes with the activities of daily

13   living and how -- about how much their subjective complaints

14   are.

15         Q.   Would an orthopedic surgeon do a knee replacement

16   based on subjective complaints of a patient?

17         A.   I have seen that done, yes.

18         Q.   And where have you seen that done?

19         A.   Several workers' compensation cases I've been

20   involved in that's been done.

21         Q.   Where the orthopedic surgeon did a knee replacement

22   surgery based on subjective complaints?

23         A.   Well, they have to have corresponding degenerative

24   changes, but the whole basis for that is the patient's

49

1    tolerance.

2        Q.    You need physical findings before an orthopedic

3    surgery -- before a well-qualified orthopedic surgeon is

4    going to perform a surgery of a knee replacement; correct?

5        A.    Physical findings, radiographic findings, and the

6    subjective history is part of it.

7        Q.    Actually, in this case, arthroscopic findings would

8    also be helpful.

9        A.    Yes.

10       Q.    And highly recommended; right?

11       A.    It would be helpful.

12       Q.    Did you make that recommendation in your report

13   here?

14       A.    No.   I'm aware that's been recommended.

15            MR. KONICEK:   Did you -- I'm going to move to

16   strike everything after no.

17       Q.    Tell me when you think the knee replacement should

18   be done.

19       A.    When it should be done?   It's not an appropriate --

20   at the present time I would expect based on his weight and

21   the altered gait that he's going to have further

22   deterioration and narrowing, I would probably expect in the

23   next five or ten years.

24       Q.    And tell me what you base that on.   I want to know

50

1    what scientific study.

2         A.   I'm basing that on my experience.

3         Q.   Okay.  Other than your experience, what scientific

4    study supports your conclusion?

5         A.   I would have to review that as far as

6    epidemiological studies.

7         Q.   Other than your experience, do you have any other

8    authoritative document to support your opinion that he needs

9    a surgery in five to ten years?

10        A.   No.  That would be something I'd have to research.

11        Q.   And you have not researched it for purposes of

12   preparing your opinion here today?

13        A.   No, I have not.

14        Q.   And your opinion is not based upon a reasonable

15   degree of orthopedic certainty, is it?

16        A.   It's on medical certainty, not orthopedic.  I think

17   that's a different definition.

18        Q.   Your opinion is not based upon a reasonable degree

19   of orthopedic certainty, is it?

20        A.   Well, I guess I need to know what your definition

21   of that means.

22        Q.   That would be a physician who specializes in

23   orthopedic surgery.

24        A.   Wouldn't it be best to make that question an

                                                              51

1  orthopedic surgery opinion?

2      Q.   Is your opinion to a reasonable degree of

3  orthopedic certainty?

4      A.   Well, I guess I have a difficult time understanding

5  your question without the prefaces I just gave you.

6      Q.   My question is, and now that I've defined

7  orthopedic certainty as one being an orthopedic surgeon, is

8  your opinion that he needs a knee replacement held to a

9  reasonable degree of orthopedic certainty?

10     A.   No.

11     Q.   Are you telling me if Mr. Hoffman lost weight he

12  could mitigate the necessity of a knee replacement?

13     A.   It is possible, yes.   Other things can be done as

14  well.

15     Q.   Right.   He could do exercises; correct?

16     A.   Exercises, nutritional supplementation, physical

17  supplementation.   These are all strategies we do.

18     Q.   And in terms of the knee in this instance, probably

19  the best thing he could do is strengthen his quadriceps;

20  correct?

21     A.   That would be helpful.

22     Q.   Did you understand that this gentleman last saw a

23  doctor for medical care and treatment was December 31st of

24  the year 2004?

52

1      A.    Yes.

2      Q.    And he had not seen a doctor until an independent

3  medical exam at Loyola, and then you.

4      A.    Correct.

5      Q.    Did he tell you he was doing anything to improve

6  the function of his leg?

7      A.    He was trying to walk.

8      Q.    Where does he say that?

9      A.    This is what he told me.

10      Q.    And where is that recorded in any of your Rule 26

11  report?

12      A.    It's not in there.

13      Q.    Did he tell you he was able to drive?

14      A.    Yes.

15      Q.    Did he tell you he was able to drive a large

16  camper?

17      A.    I did not ask him if he drove a large camper.  I

18  did not know that was something he drove.

19      Q.    Would that surprise you?

20      A.    Would that surprise me?

21      Q.    Right.

22      A.    No.

23      Q.    He's capable of driving a camper that's three tons.

24      A.    Would that surprise me?  No.

1    Q.   He's capable of driving a truck.

2    A.   Some trucks he could possibly do.  Vans he would

3    probably have difficulty.  It would be difficult in my

4    opinion with the work restrictions I've issued as far as any

5    type of a vehicle that would require tarping, rolling a fifth

6    wheel, those type of difficulties would be difficult for him.

7    Q.   Let's forget about what would happen outside the

8    truck in terms of tarping or anything like that, or rolling a

9    fifth wheel.  Driving a semi, he could drive a semi; correct?

10   A.   He certainly could drive a semi if he got hand

11   controls.  I would make sure he was okay.  I would have some

12   concerns about his braking ability and accelerator.  I mean,

13   if there were some modifications, I think he could do some

14   things.

15   Q.   The only thing that would be need to be modified,

16   if anything, would be the pedals; correct?

17   A.   You're talking about the accelerator pedals?

18   Q.   And the brake pedals.

19   A.   Yes.

20   Q.   That's assuming he, in fact, has a two-inch shorter

21   right leg?

22   A.   Well, that's not the reason why he needs the

23   pedals.

24   Q.   Are you saying because of strength?

1      A.    Correct.

2      Q.    Did you do strength testing?

3      A.    Well, I wanted to get a functional capacity

4    evaluation and Cybex testing and it's not been done.

5      Q.    Did you do strength tests, yes or no?

6      A.    I did some gross manual testing, but I wanted to do

7    more objective computerized.

8      Q.    Where is the gross manual testing set forth in your

9    Rule 26 report?

10      A.    It's not in there.

11      Q.    Okay.  Did you do any scientific testing, that is

12    testing that would be qualified as medicinal testing in your

13    field, occupational environmental medicine?

14      A.    Well, that was my request for the FCE testing.

15      Q.    But you haven't done it; correct?

16      A.    I have not.

17      Q.    So you don't know what his strengths are or are not

18    with regard to the right leg; correct?

19      A.    Well, that's why I wanted to do that testing.

20      Q.    I understand.  I'm not critical of you.  I'm not

21    making judgments.  My question is, Dr. Fletcher, you don't

22    know what his strengths are with regard to the right leg.

23      A.    I don't know objectively scientifically without

24    being able to do that testing.

1     Q.    What we do know scientifically from the physical

2  exam that was performed regarding the circumference

3  measurements is that the right leg appears to be as strong,

4  if not stronger, than the left leg; correct?

5     A.    Correct, the circumferal measurements.

6     Q.    Right.  And from -- going back to my question, from

7  the data that you have, he is capable of driving a semi;

8  correct?

9     A.    In my opinion he could drive some truck vehicles.

10    Q.    Okay.  Do you need to do follow-up work in order to

11 give your opinions to a reasonable degree of medical

12 certainty?

13    A.    Well, again, the functional testing would be really

14 helpful for me.

15    Q.    Okay.  Hey, this was sitting in your room there.

16              (Fletcher Exhibit Number 4 was marked for

17              identification.)

18    A.    Yes.

19    Q.    Is this part of the advertisement that you do or

20 what?

21    A.    Yes.

22    Q.    Marketing, I guess?

23    A.    Yes.

24    Q.    Where else do you market?

56

1    A.   My website.

2    Q.   Anywhere else?  Magazines?

3    A.   No, I don't do magazines.  I mean, I speak at

4 conferences.

5    Q.   For lawyers?

6    A.   Correct.

7    Q.   In the hopes of getting business for their medical/

8 legal work; correct?

9    A.   Correct.  I've got to put food on the table.

10    Q.   Showing you Fletcher Number 4, that's the

11 advertisement, Dr. Fletcher, that I was referring to;

12 correct?

13    A.   Correct.  It's a marketing brochure for a

14 conference.

15    Q.   And then, for the record, the only x-ray that was

16 taken, Dr. Fletcher, is what I've got here marked as Exhibit

17 Number 3?

18    A.   Correct.

19    Q.   And would you agree with me that Dr. Noonan is more

20 qualified in terms of an opinion whether or not this fellow

21 is going to need knee replacement in the future?

22    A.   I would disagree with that.

23         MR. KONICEK:  Okay.  I don't have any other

24 questions.

1          MS. LOEB:  I have no questions.

2          MR. KONICEK:  I do have one more.

3     Q.   How much have you charged in this case?

4     A.   Just a thousand dollars so far, plus today's dep.

5     Q.   So the thousand dollars doesn't include today's

6 dep?

7     A.   I think a thousand for the report and I think a

8 thousand for the dep, so two thousand dollars so far, and the

9 x-ray is probably 70, 80 bucks.

10    Q.   Are you doing an hourly or flat fee?

11    A.   I did the flat fee today, unless it went very long.

12    Q.   It didn't?

13    A.   It didn't.

14         MR. KONICEK:  All right.  I'm done.

15         DR. FLETCHER:  Okay.  I will reserve signature.

16         MR. KONICEK:  You can't.

17              (Deposition concluded at 6:02 p.m.  Signature

18              waived.)

19

20

21

22

23

24

58

1  STATE OF ILLINOIS  )
                     )   SS
2  COUNTY OF MACON   )

3

4        I, LISA K. HAHN, a Notary Public, Certified

5  Shorthand Reporter, and Registered Merit Reporter in and for

6  the County of Macon, State Of Illinois, DO HEREBY CERTIFY,

7  that pursuant to agreement between counsel there appeared

8  before me on Thursday, October 9, 2008, at the offices of

9  Safeworks Illinois, 1806 N. Market Street, Champaign,

10  Illinois, DAVID J. FLETCHER, M.D., who was first duly sworn

11  by me to testify to the whole truth of his knowledge touching

12  upon the matter in controversy aforesaid so far as he should

13  be interrogated concerning the same; that he was examined and

14  his examination was taken down in shorthand by me and

15  afterwards transcribed by stenographic means; that the

16  deposition is a true record of the testimony given by the

17  witness; and that the signature of the deponent is waived.

18        IN WITNESS WHEREOF, I have hereunto set my hand and

19  affixed my Notarial Seal this 17th day of October, 2008.

20

21            *Lisa K Hahn*
             Notary Public, CSR and RMR

22

23

24  CSR #84-2149

"OFFICIAL SEAL"
Lisa K. Hahn
Notary Public, State of Illinois
My Commission Exp. 08/27/2009

59